**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

KRIS ELLIOT HIGLEY, *et al.*,

           Plaintiffs,

      v.

CESSNA AIRCRAFT CO., *et al.,*

           Defendants.

Case No. CV 10-3345 JCG

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## INTRODUCTION

The instant action involves a manufacturing defect claim against Defendant Continental Motors, Inc. ("Defendant").  Plaintiffs Kris Elliot Higley and Molly Lauren Higley (collectively, "Plaintiffs") contend that Defendant manufactured a defective fuel pump that was installed on a plane on which Plaintiffs were traveling. That plane crashed in Namibia, Africa, on May 8, 2008 (the "Accident").

From July 15 to July 19, 2013, the Court held a bifurcated bench trial to consider the issue of Defendant's liability on Plaintiffs' manufacturing defect claim. After carefully considering and weighing the evidence and arguments presented at trial, including the evaluation of the demeanor and credibility of the witnesses and the deposition testimony of unavailable witnesses, the Court finds and concludes as follows.

# SUMMARY

The Court is sympathetic to the injuries suffered by Plaintiffs. But based on the evidence, Plaintiffs have failed to carry their burden of proof on their manufacturing defect claim. The Court will not unnecessarily repeat its specific findings of fact and conclusions of law as detailed below. Instead, the Court will briefly underscore its chief rationales and the supporting evidence here.

As an initial matter, the Court concludes that the IO-550 Fuel Pump was, in fact, on the Aircraft on the day of the Accident, and there is insufficient proof to justify Defendant's "scavenger" theory. Nonetheless, the Court cannot conclude that the IO-550 Fuel Pump contained a defect when it left Defendant's possession. The IO-550 Fuel Pump, in its basic and assembled form, was repeatedly inspected and tested, and operated sufficiently for a hundred-plus hours prior to the Accident. Dr. Kar's opinion – that a defect existed from the start – rests too much on questionable results from the Seal Labs testing, among other things. It is also notable that, a mere few days after the Accident, the IO-550 Engine was tested. Although the measurements of the test could have been more rigorous and precise, the evidence reveals that the IO-550 Engine, including its fuel mixture, operated normally.

Further, Defendant's expert credibly presented evidence that, if the IO-550 Fuel Pump's bushing were indeed spinning within its housing, as Plaintiffs contend, the amount of torque required in such a situation would consequently break its coupling. Yet, the coupling of the IO-550 Fuel Pump was found intact. Plaintiffs' experts failed to refute this potent contention. And while Plaintiffs advanced the position that the IO-550 Fuel Pump was defective because the Aircraft reached 150 pounds per hour during the takeoff, Defendant's expert plausibly explained away such a spike and amplified that, if such a dramatic fuel flow loss existed at the time, it would have been evident to the pilot.

Now, it remains undisputed that Mr. Webb, a seemingly independent party, found that the IO-550 Fuel Pump was defective when he received it. But Defendant's

2

expert piercingly explained that the "bluing" of the bushing, and the lack of bromine in the IO-550 Fuel Pump, leads to the determination that the damage could not have occurred on a running engine.

Additionally, the Court cannot conclude that a defect in the IO-550 Fuel Pump was a substantial factor in causing Plaintiffs' harm.  The evidence presented at trial sways the Court that the pilot, Dean McConnell ("McConnell"), was an inexperienced and overconfident pilot.  The Court is left with the firm impression that McConnell failed to conduct critical calculations, follow standard aircraft control procedures, consult pre-flight checklists and, last but not least, diligently check the fuel quantity.

The issue of fuel quantity merits elaboration.  Prior to the Accident, McConnell requested 310 pounds of fuel on the Aircraft.  Yet, the fuel receipt reflects an addition of only 185 pounds of fuel.  Perhaps, as Plaintiffs' suggest, McConnell was only requesting a "topping off."  But in the context of all that occurred, including failing to weigh passengers, the discrepancy of 125 pounds of fuel was not insignificant.  This discrepancy, together with Defendant's supporting expert testimony on this point, suggests that the Aircraft was, at a minimum, above suggested weight and, worse yet, grossly overweight when it departed Eros Airport.

In the end, an unfortunate accident occurred and Mr. Webb received a damaged IO-550 Fuel Pump.  On this record, however, Plaintiffs fail to logically and causally connect these two facts to Defendant, and the Court thus finds in favor of Defendant.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## FINDINGS OF FACT

For ease of reference, the Court discusses the findings of fact in chronological order.

## I.   PARTIES

1.   At the time of the Accident, Plaintiffs were citizens of the State of California. (Def. Supplemental Findings of Fact ("Supp. FOF"), at ¶¶ 1-2.)

2.   Defendant is a citizen of the State of Delaware, having its principal place of business in Mobile, Alabama.  (*Id*., at ¶ 3.)  Defendant manufactures piston engines for small aircraft.  (*Id.*)

## II.   BACKGROUND

### A.   Manufacturing of the IO-520 and IO-550 Engines and Fuel Pumps

3.   The pertinent facts begin in 2004.  On December 19, 2004, Defendant manufactured an IO-520 engine, serial number 295376 (the "IO-520 Engine"), along with its assembled fuel pump, serial number BO4JA223R (the "IO-520 Fuel Pump"). (Tr. Exhs. 400, 413.)  As was Defendant's custom, a cooling shroud was placed over the IO-520 Fuel Pump.  (Barton Tr. Day 4, Vol. 3, at 76:9-11.)

4.   In January of 2005, the IO-520 Engine and the IO-520 Fuel Pump were shipped to distributor Air Power, Inc., and then to Scenic Air PTY (LTD) ("Scenic Air") in Namibia.  (Tr. Exhs. 400, 413; Barton Tr. Day 4, Vol. 3, at 37:7-10.)

5.   On October 23, 2006, the IO-520 Engine and the IO-520 Fuel Pump were installed on a Cessna 210M aircraft, registration number V5-LSO (the "Aircraft").  (Tr. Exhs. 273, 377, 413; *see also* Stipulation of Facts ("Stip."), at ¶ 15.)

6.   Two and a half years later, in May of 2007, a new basic fuel pump, serial number T7848, was manufactured, inspected, and tested by TAT, an Israeli aerospace components supplier, along with 170 other new basic fuel pumps.  (Paul Eberly Deposition, dated July 11, 2011 ("Eberly Dep."), at pp. 15:19-18:19, 41:18-42:20;

Barton Tr. Day 4, Vol. 3, at 21:13-22:22; Tr. Exh. 638.)  Each basic fuel pump was comprised of a steel shaft, an aluminum housing, and a phosphorous bronze bushing. (Eberly Dep., at pp. 44:19-48:20; Barton Tr. Day 4, Vol. 2, at 95:1-7.)  TAT's basic fuel pumps were tested as a unit, with data output measuring its performance.  (Barton Tr. Day 4, Vol. 2, at 97:17-98:22, Vol. 3, at 12:3-7; Tr. Exhs. 209, 225, 377, 638.)

7.      The basic fuel pumps were then purchased by and shipped to Defendant as a finished part.  (Barton Tr. Day 4, Vol. 2, at 95:8-16; Tr. Exh. 638.)

8.      Defendant then manufactured an IO-550 fuel pump, serial number B07JA132R (the "IO-550 Fuel Pump"), using one of TAT's basic fuel pumps, serial number T7848.  (Eberly Dep., at pp. 14:11-16:23, 21:12-22:9; Tr. Exhs. 47, 377; Barton Tr. Day 4, Vol. 3, at 21:13-22:22, 23:20-24:18.)

9.      On October 16, 2007, the IO-550 Fuel Pump, like all assembled pumps manufactured by Defendant, was inspected on a fuel flow test bench to ensure that it was defect-free and could run properly in its assembled state.  (Barton Tr. Day 4, Vol. 3, at 8:24-11:15; Tr. Exhs. 377, 644-45, 648-49; Def. Supp. FOF, at ¶ 34.)  During the testing, the IO-550 Fuel Pump operated within Defendant's required quality control specifications.  (Def. Supp. FOF, at ¶ 35.)  Defendant then placed the IO-550 Fuel Pump in a sealed plastic bag and stored it in its warehouse.  (D. Sommer Tr. Day 2, at 179:3-180:2; Barton Tr. Day 4, Vol. 3, at 14:10-15:3.)

10.     When Defendant began the process of building the IO-550 engine, serial number 289225 (the "IO-550 Engine"), the IO-550 Fuel Pump was pulled from storage and tested once more.  (Barton Tr. Day 4, Vol. 3, at 29:19-31:18; Tr. Exhs. 652-53.)  The IO-550 Fuel Pump again passed Defendant's inspections.  (*See* Barton Tr. Day 4, Vol. 3, at 32:23-33:14; Tr. Exh. 225.)

11.     On October 29, 2007, the IO-550 Fuel Pump was assembled to the IO-550 Engine.  (Eberly Dep., at pp. 21:12-22; Barton Tr. Day 4, Vol. 2, at 90:4-19, Vol. 3, at 28:13-29:15; Tr. Exh. 225; *see* Stip., at ¶ 19.)  Defendant then conducted an engine test on the fully assembled IO-550 Engine containing the IO-550 Fuel Pump, and again

found that it was operating normally and within required specifications.  (Def. Supp. FOF, at ¶¶ 39-40; Barton Tr. Day 4, Vol. 3, at 76:2-8; Tr. Exh. 225.)

12.    Per custom, a cooling shroud was not placed over the IO-550 Fuel Pump during manufacturing.  (C. Sommer Tr. Day 1, at 125:12-126:1; Barton Tr. Day 4, Vol. 3, at 76:2-8; Tr. Exh. 400.)

### B.    Regulation Protocols for Manufacturers of Aircraft Engines

13.    The Federal Aviation Administration ("FAA") regulates all aspects of the aviation industry, including the manufacture of aircraft and aircraft engines.  (Barton Tr. Day 4, Vol. 2, at 86:24-87:16.)

14.    In order to manufacture an aircraft or aircraft engine, manufacturers must obtain, *inter alia*, a Production Certificate.  (Def. Supp. FOF, at ¶ 11; Barton Tr. Day 4, Vol. 2, at 87:17-88:18.)  And, in order to obtain a Production Certificate, the FAA requires manufacturers to maintain a reliable quality control system and inspection and test procedures.  (Def. Supp. FOF, at ¶¶ 11, 13; Barton Tr. Day 4, Vol. 2, at 87:14-91:22, 92:12-14, 93:16-24; Tr. Exh. 676; Eberly Dep., at pp. 62:23-65:20.)

15.    After a Production Certificate is issued by the FAA to the manufacturer, the FAA continues to have constant oversight to ensure the manufacturer is in compliance with the requirements of the Production Certificate.  (Def. FOF, at ¶ 11.)

16.    The FAA approved Defendant's manufacturing process and its quality control systems.  (Barton Tr. Day 4, Vol. 2, at 94:13-25, 97:7-10.)  In particular, the FAA issued a Production Certificate and a Production Limitation Record to Defendant for the IO-550 model engine.  (*Id.*; Tr. Exhs. 373-376.)  Similarly, the FAA also deemed the Aircraft as airworthy.  (C. Sommer Tr. Day 1, at 130:15-131:9; Edwards Tr. Day 3, Vol. 2, at 153:23-154:8, 154:18-23.)

### C.    Shipment of IO-550 Engine and IO-550 Fuel Pump to Namibia

17.    On November 8, 2007, Defendant shipped the IO-550 Engine and the IO-550 Fuel Pump to Air Power, who then shipped both parts to Scenic Air in Namibia.  (Tr. Exhs. 413, 656; Barton Tr. Day 4, Vol. 2, at 55:5-18; Stip., at ¶¶ 20-21.)

18.     Prior to its installation on an aircraft, however, a cooling shroud was placed over the IO-550 Fuel Pump, thus covering its serial and part numbers.  (*See, e.g.*, C. Sommer Tr. Day 1, at 25:16-23 (stating that serial numbers may be etched on the shroud with permanent marker), 22:16-23:2, 245:4-7; Tr. Exh. 201; Pls. Tr. Brief, at p. 5.)

19.     On January 14, 2008, Scenic Air removed the IO-520 Engine and the IO-520 Fuel Pump from the Aircraft, and placed the parts in storage.  (*See* Stip., at ¶ 16.)  At the time, the IO-520 Engine and the IO-520 Fuel Pump had a total operating time of 1,640 hours.  (Pls. Supp. FOF, at ¶ 7.)

20.     On the same day, Scenic Air installed the IO-550 Engine and the IO-550 Fuel Pump in the Aircraft in accordance with Defendant's installation requirements and Namibian regulations, which included checking the Aircraft's fuel pressure.  (Barton Tr. Day 4, Vol. 3, at 37:2-38:23, 41:14-23, 42:4-44:11; Tr. Exhs. 212, 218, 273, 403, 406, 656-57.)

21.     On March 18, 2008, the IO-520 Engine and the IO-520 Fuel Pump were removed from storage and installed on a Cessna V5-Ten.  (Barton Tr. Day 4, Vol. 3, at 37:14-38:13; Tr. Exh. 413.)  One month later, the IO-520 Engine and the IO-520 Fuel Pump were removed from service due to their hours limit after 2,041.7 hours of flight.  (*Id.*)

### D.     Mandatory Periodic Inspections

22.     Relatedly, the FAA required periodic inspections of civil commercial aircraft, both annually and every 100 hours of operation, during which the fuel pump, fuel system, and fuel flows are inspected.  (Tr. Exh. 215, Cessna Centurion 1978 Model 210M Pilot's Operating Handbook ("POH"), at p. 8-5; Webb Deposition, dated October 8, 2010 ("Webb Dep."), at p. 47:13-24.)

23.     The Namibian Government also required periodic inspections of aircrafts registered within the country, including a full check of their fuel system, in what is known as a Mandatory Periodic Inspection ("MPI").  (Barton Tr. Day 4, Vol. 3, at

39:9-25; Tr. Exh. 657; *see* Stip., at ¶ 13.)

24.     The first MPI of the Aircraft after installation of the IO-550 Engine was performed on January 14, 2008; the second MPI was conducted on March 7, 2008; and the last MPI of the Aircraft was certified on May 8, 2008, at 8,656.4 airframe hours in accordance with manuals and regulations, and was conducted after 180 hours of flight. (Barton Tr. Day 4, Vol. 3, at 37:25-38:23, 39:9-41:13, 44:12-47:12; C. Sommer Day 1, at 235:1-12; Tr. Exhs. 203-05, 273, 657; *see also* Stip., at ¶ 11.)

25.     All applicable Airworthiness Directives and Service Bulletins on the Aircraft were complied with during the three MPIs.  (C. Sommer Tr. Day 1, at 136:14-140:3, 235:1-12; Barton Tr. Day 4, Vol. 3, at 44:12-47:12; Eberly Dep., at p. 29:11-20; Tr. Exhs. 200, 218, 657.)

## III.     THE ACCIDENT

### A.     Airport and Aircraft Conditions

26.     The Accident occurred on May 9, 2008 outside Eros Airport in Windhoek, Namibia during a scheduled flight to Mokuti Lodge.  (Stip., at ¶¶ 1, 5.)

27.     The elevation of the Eros Airport was 5,584 feet above sea level, and the density altitude was approximately 8,100 feet.  (Jason Lukasik Deposition, dated July 11, 2011 ("Lukasik Dep."), at p. 64:4-11; Tr. Exh. 202, at p. 9; Stip., at ¶ 7.)  On the day of the Accident, the outside air temperature was 72 degrees Fahrenheit.  (Stip., at ¶ 6.)

28.     At the time of the Accident, the Aircraft was registered to Scenic Air, (*id.* at ¶ 2), and the IO-550 Engine had operated for a total of 198.2 hours since it was installed on the Aircraft in January of 2008.  (*Id.*, at ¶ 18.)

### B.     The Pilot's Qualifications

29.     Dean McConnell ("McConnell") was the pilot in command for the Accident flight.  (*See id.*, at ¶ 8.)

30.     McConnell had a South African Commercial Pilot License with Instrument and Night Ratings, issued on April 26, 2006, and a Namibian validation issued on May 5, 2008.  (*Id.*, at  ¶ 9.)  McConnell's Medical Certificate was issued on April 10, 2008,

and he had an aircraft type endorsement on his licenses.  (*Id*.)

31.    McConnell began working for Scenic Air on May 4, 2008, four days before the Accident.  (McConnell Deposition, dated Oct. 7, 2010 ("McConnell Dep."), at p. 11:9-22.)  The Accident flight was McConnell's first flight for Scenic Air, and was also his first flight out of Eros Airport as a pilot in command with passengers.  (*Id*., at pp. 25:4-24, 32:35-33:9, 40:24-41:3; Stip., at ¶ 8.)

32.    On the day of the Accident, McConnell had 711.38 total flying hours, with 30.5 hours in the 90 days prior to the Accident and 20.4 total hours in a Cessna 210 aircraft.  (Stip., at ¶ 10; Tr. Exh. 202, at p. 3.)

### C.    McConnell's Flight Calculations Prior to the Accident

33.    On the night before the Accident, McConnell conducted certain performance calculations for the flight on a software program called "Easy Plan."  (McConnell Dep., at pp. 34:12-35:4, 65:22-66:5, Exh. 18; Stip., at ¶ 41.)  Scenic Air also provided McConnell with passenger and baggage data, based on "average" weights for each calculation, to generate his own weight and balance figures.  (McConnell Dep., at pp. 44:8-45:23.)

34.    McConnell, however, did not refer to any performance graphs or to the POH on the night before the Accident, nor did he perform any relevant density calculations.  (*Id*., at pp. 36:19-22, 39:23-40:6; Tr. Exh. 215; Stip., at ¶ 42; Def. Request for Admission ("RFA") No. 64.)  McConnell also could not remember whether he ever reviewed the Cessna 210M Supplemental Pilot Operating Handbook ("SPOH").  (McConnell Dep., at p. 58:20-24.)

### D.    The Morning of the Accident

35.    On the morning of the Accident, Scenic Air employees were performing maintenance on the Aircraft up to the flight's scheduled departure, causing a thirty minute delay in the flight.  (*Id*., at p. 59:12-18; Tr. Exh. 21-B.)  McConnell was "dismayed" at the delay and appeared "agitated" and "quite flustered about the whole situation."  (*Id*.; Momsen Deposition, dated July 22, 2011 ("Momsen Dep."), at pp.

21:7-22:5, Exh. 55.)

36.   Once the Aircraft was ready, however, McConnell proceeded with his pre-flight routine, including "sumping" the fuel tanks for water impurities.  (Tr. Exh. 21-B.)

37.   Then, McConnell requested refueling from Air BP, and asked that 125 liters per main tank and 30 liters per tip tank be added to the Aircraft, for a total of 310 liters. (McConnell Dep., at p. 122:12-19; Tr. Exh. 21-B.)  McConnell, however, did not remember how much fuel was in the Aircraft prior to Air BP's refueling.  (McConnell Dep., at p. 93:29-22.)  Nor did McConnell visually check the fuel quantity in the right or left wing, as required by the POH.  (Barton Tr. Day 4, Vol. 2, at 18:14-19:2; Tr. Exh. 215.)

38.   McConnell thereafter noted that fuel caps were on and in place on the Aircraft, but did not sump the fuel tanks again, as required by the POH.  (Tr. Exh. 202, at p. 2; Edwards Tr. Day 3, Vol. 2, at 155:25-156:25.)  Nor did McConnell consult the POH's pre-flight checklist procedures, (POH, at p. 4), or any checklists as mandated by Namibian regulations.  (*See* McConnell Dep., at pp. 103:10-17; *see also* D. Sommer Tr. Day 2, at 268:25-269:4, 269:22-270:25; Edwards Tr. Day 3, Vol. 2, at 117:1-119:9.)  Instead, McConnell relied on his memory to perform pre-flight, run-up, and power checks.  (McConnell Dep., at pp. 102:1-103:17.)

### E.   Pre-flight Weight and Balance Calculations

39.   On the day of the Accident, the Aircraft had an approximate empty weight of 2,310 pounds, was type certificated for a maximum gross weight of 3,800 pounds, and was scheduled to carry four passengers, including Plaintiffs, during the Accident flight. (POH, at p. 2-6; Stip., at ¶¶ 4, 38, 40.)

40.   With respect to Scenic Air's weight and balance requirements for passengers, the company restricted luggage to 44 pounds (or 20 kilograms) per person, including hand luggage.  (McConnell Dep., at pp. 45:4-46:3, 83:17-84:8; Exh. 19.)

41.   Prior to takeoff, McConnell weighed some of the passengers' baggage with Scenic Air's company issued terminal scale ("T scale"), and thereafter "eyeballed" the

10

weight of the remaining luggage. (*See* McConnell Dep., at pp. 62:19-63:6, 78:9-79:14, Exh. 18; *see also* D. Sommer Tr. Day 2, at 212:10-213:10.) McConnell, however, did not tie down the luggage in the Aircraft as required by the POH. (McConnell Dep., at pp. 62-63; POH, at p. 6-6.) Nor did McConnell "actually weigh each individual passenger[.]" (McConnell. Dep., at p. 69:7-20.) Rather, McConnell asked each passenger his or her own weight, and used that answer in his calculations. (*Id.*) McConnell also opted to perform those calculations in kilograms rather than pounds. (*Id.*, at pp. 78:14-79:14; POH, at p. 6-6.)

42.    In all, McConnell calculated passenger weight at 3,181.7 pounds, baggage weight at 110.2 pounds, and fuel at 491.1 pounds, for a total weight of 3,783 pounds. (Exh. 18.)

**F.    The Aircraft's Takeoff and the Accident**

43.    After preparations for the flight were completed and the passengers and their luggage were loaded, McConnell requested and received take-off clearance from the Eros Airport tower. (McConnell Dep., at p. 100:8-16; M. Higley Tr. Day 3, Vol. 2, at 14:20-15:9.)

44.    McConnell gave power to taxi onto the runway and simultaneously enriched the engine mixture "approximately two turns so as to achieve the 130 [pounds] fuel flow per hour required for Eros airports elevation." (McConnell Dep., at p. 126:12-22; Tr. Exh. 21-B.) McConnell testified that during this time, the Aircraft and its engine were operating normally. (McConnell Dep., at pp. 103:24-104:1, 109:6-14; Barton Tr. Day 4, Vol. 3, at 48:6-18.)

45.    The Aircraft thereafter departed on runway 01, and became airborne "just after the fire station." (McConnell Dep., at pp. 107:23-108:1.)

46.    Once Airborne, McConnell distinctly remembered seeing the fuel flow increase to 150 pounds per hour, and thereafter reducing it back to 130 pounds per hour. (*Id.*, at pp. 126:12-128:12, 133-34; Stip., at ¶ 33; Def. RFA No. 35.)

47.    McConnell initially reported normal rotation and climb-out of the Aircraft.

(McConnell Dep., at pp. 108:7-109:17.)  But, at about 50-150 feet above ground, airspeed began to decay and McConnell "put the nose forward to maintain" speed. (*Id.*, at pp. 127:22-128:4; Tr. Exh. 21-B.)  McConnell kept the landing gear and take-off flaps (set at ten degrees) down.  (McConnell Dep., at pp. 105:3-9, 109:10-111:16.) The setting of the Aircraft's flaps should have normally allowed a climb of approximately 150 feet per minute.  (POH, at pp. 5-12, 3; Lukasik Dep., at pp. 65:18-66:19; Tr. Exh. 202, at p. 10.)

48.     McConnell did not recall hearing any abnormal sounds from the engine, nor did he recall observing any anomalies from the fuel flow indicator.  (McConnell Dep., at pp. 119:23-25, 129:24-130:3; Momsen Dep., at p. 44:6-9 (eyewitnesses reported that the engine sounded normal).)

49.     Several people witnessed the takeoff from the ground.  Eyewitness Marco De Vres, for example, told investigators that "the aircraft sounded like it was running at full throttle when it passed him at approximately 100 feet above the runway and perpendicular to WestAir's Hangar."  (Lukasik Dep., at p. 32:2-20; Tr. Exhs. 202, 243.)

50.     Eyewitness Diane Burger told investigators that "the aircraft appeared to have departed the runway later than she was normally used to seeing" and "that it appeared that the aircraft was hanging off of its propeller."  (Lukasik Dep., at p. 32:2-20; Edwards Tr. Day 3, Vol. 2, at 134:13-135:7; Tr. Exhs. 202, 243.)

51.     As the Aircraft's airspeed continued to decay, McConnell applied intermediate flaps (known as "bush flaps") to the Aircraft, extending them to 18 degrees, contrary to the POH requirements.  (McConnell Dep., at pp. 111:17-112:7; Tr. Exh. 21-B; Barton Tr. Day 4, Vol. 2, at 24:14-15, 40:15-43:12.)

52.     McConnell, however, did not use any written checklists or use the auxiliary fuel pump after the airspeed decay.  (McConnell Dep., at pp. 116:18-117:21; Edwards Tr. Day 3, Vol. 2, at 123:7-124:4; *see also* POH, at p. 3-19 ("In the event of an engine-driven fuel pump failure during takeoff, [pilots should] immediately hold the left half

of the auxiliary fuel pump switch in the HI position until the airplane is well clear of obstacles"); Tr. Exh. 215.)  Nor did McConnell raise the landing gear at any point during the entire flight sequence, as required by the POH.  (McConnell Dep., at p. 119:7-13; Barton Tr. Day 4, Vol. 2, at 24:7-15.)

53.    McConnell eventually determined that the Aircraft was "beyond the point that [he] could land [safely] back on the runway."  (McConnell Dep., at p. 110:6-19.)  He thus decided to land off the airport and, in the process, hit a tree, a high-tension power wire, and thereafter impacted the ground.  (*Id.*, at pp. 112:17-113:5, 117:14-118:7.)

54.    McConnell, Plaintiffs, and the other passengers on board sustained injuries as a result of the Accident.  (Tr. Exh. 202, at p. 2.)

55.    Afterwards, McConnell reported that he believed the Accident was caused by power loss, rather than a failure of the IO-550 Engine itself.  (McConnell Dep., at p. 19:17-21.)

**IV.    POST-ACCIDENT EVENTS**

   **A.    Initial Namibian Investigation**

56.    Immediately after the Accident, an investigation was conducted by the Namibian Ministry of Works and Transport Directorate of Aircraft Accident Investigations.  (Tr. Exh. 201.)

57.    To that end, on May 12, 2008, three days after the Accident, WestAir Maintenance ("WestAir"), under the supervision of the Namibian investigators, removed the IO-550 Engine from the Aircraft and installed it on another Cessna 206 airframe.  (Lukasik Dep., at pp. 74:8-75:11; *see also* Barton Tr. Day 4, Vol. 2, at 73:3-75:4.)  WestAir then performed a series of test runs on the IO-550 Engine.  (*Id.*; Tr. Exh. 201, at 5.)  During the test runs, WestAir ran the IO-550 Engine "up numerous times to full throttle," and reported that it performed normally "without any sort of hesitation or . . . stumbling."  (Lukasik Dep., at p. 75:1-5; *see also* Stip., at ¶ 32.)

58.    The IO-550 Engine was thereafter stripped for further investigation, but no abnormalities were discovered.  (Tr. Exh. 200, at 5.)  And, the coupling from the IO-

550 Engine, which is designed to break when there is fuel pump stoppage, was found intact. (*See, e.g.*, Barton Tr. Day 4, Vol. 3, at 60:21-61:8, 64:10-65:1; Morris Tr. Day 5, Vol. 2, at 55:6-10; Eberly Dep., at p. 37:7-16; Tr. Exh. 343.)  Investigators did not, however, take the shroud off the IO-550 Fuel Pump during their investigation.  (Pls. Tr. Brief, at p. 7; Pl. Supp. FOF, at ¶ 16.)

59.     The IO-550 Engine remained in WestAir's possession from approximately May 13, 2008 until June of 2009.  (Lukasik Dep., at pp. 88:14-89:17; Tr. Exhs. 658-59.)

**B.      Original Namibian Civil Accident Report**

60.     The Original Republic of Namibia Civil Accident Report ("Original Report"), dated June 1, 2009, concluded that pilot error caused the Accident.  (Tr. Exh. 201, at pp. 6-8.)

61.     The Original Report also identified the IO-520 Fuel Pump – which was "found intact and in normal operating condition" – as the fuel pump on the IO-550 Engine during the Accident.  (Tr. Exh. 201, App'x 16; Stip., at ¶ 22.)

**C.      Tests at Alton Air**

62.     Brian Webb was employed as a component overhaul fitter at Alton Air Services ("Alton Air") for over nine years.  (Webb Dep., at p. 7:19-21.)

63.     On August 12, 2009, WestAir sent Mr. Webb a fuel pump for a shockload inspection.  (*Id*., at pp. 9:13-11:14.)  Upon examination, Mr. Webb identified the part as the IO-550 Fuel Pump, though all of the accompanying paperwork mistakenly identified it as the IO-520 Fuel Pump.  (*Id*., at pp. 11:2-8, 15:6-9, 65:16-66:3; Momsen Dep., at pp. 45:2-47:2, Exhs. 37, 58.)

64.     On August 13 or 14, 2009, Mr. Webb disassembled and inspected the IO-550 Fuel Pump.  (Webb Dep., at p. 17:3-16.)  Mr. Webb neither tested the IO-550 Fuel Pump nor operated it on a flow bench prior to disassembly.  (Webb Dep., at pp. 20:22-21:14, 37:7-24; Stip., at ¶¶ 30-31.)

65.     During disassembly, Mr. Webb discovered the IO-550 Fuel Pump's safety wire and lead seal intact.  (Webb Dep., at pp. 36:24-37:3.)  Mr. Webb also noticed that the

IO-550 Fuel Pump's bushing, though loose in the housing, had seized onto the drive shaft.  (*Id.*, at p. 23:17-24.)  Mr. Webb was then able to remove the bushing from the shaft "[b]y hand."  (*Id.*, at p. 24:4-12.)

66.     On August 19, 2009, Mr. Webb informed the Namibian authorities that the IO-550 Fuel Pump was damaged.  (*Id.*, at pp. 13:6-24, 24:14-25:12, Exh. 26.)  Specifically, Mr. Webb stated that the IO-550 Fuel Pump's drive shaft had been binding in its bushing, causing the bush to turn within its housing.  (*Id.*)  The rubbing of the bush, a "bronze-type" metal, against the housing, an aluminum metal, resulted in "wear of bush and the housing," and created a gap between the two metals.  (*Id.*)  Mr. Webb concluded that "this gap [allowed] fuel to pass from the pressure side of the pump . . . to the inlet side of the pump," resulting in a "loss of fuel pump pressure and a subsequent loss of fuel flow[.]"  (*Id.*, at p. 60:14-22, Exh. 33.)

67.     Webb photographed the damage to the IO-550 Fuel Pump, and specifically noted wear marks on the inside and outside diameters of the bushing and the steel shaft, which itself contained white marks.  (*Id.*; *see also* Eberly Dep., at p. 48:8-23.)

68.     On August 21, 2009, Mr. Webb returned the disassembled IO-550 Fuel Pump to WestAir.  (Webb Dep., at p. 50:16-22.)  Mr. Webb reported that he had never before seen a fuel pump manufactured by Defendant in such a condition, but acknowledged that the condition of the IO-550 Fuel Pump may have occurred on a fuel test bench.  (*Id.*, at pp. 34:12-36:23, 56:2-10.)

### D.     Revised Namibian Civil Accident Report

69.     On November 9, 2009, the Revised Republic of Namibia Civil Accident Report ("Revised Report") was released, which adopted Mr. Webb's findings and conclusions.  (Stip., at ¶¶ 23-24, 27-28; Tr. Exh. 200, at pp. 8-9, App'x 35.)

70.     The Revised Report found that McConnell was a novice pilot of the Aircraft.  (Tr. Exh. 200, at pp. 7-8.)  In particular, the Revised Report noted that during McConnell's conversion training, the pilot in command recommended that McConnell "familiarize himself with the fuel flow [] of the Turbo[,]" be "punctual on the after

take-off checks regarding the engine settings . . . do some research on Turbo-Charges . . .[and] remember to check the Aircraft Operation Manual [] and use EGT indication when in doubt with regards to fuel flow [] during cruise and climbing."  (*Id.*; *see also* Edwards Tr. Day 3, Vol. 2, at 115:15-116:25; Tr. Exh. 96.)

71.    The Namibian Government did not inspect or examine the IO-550 Fuel Pump at any point prior to the release of the Revised Report.  (Tr. Exh. 202, at p. 12.)

### E.    The Parties' Inspection of the IO-550 Fuel Pump

72.    On October 6, 2010, Plaintiffs and Defendant inspected the disassembled IO-550 Fuel Pump in Johannesburg, South Africa (the "South African inspection"). (Lukasik Dep., at pp. 19:8-21:21; Tr. Exh. 202, at p. 15.)  Using a calibrated digital instrument, the parties took measurements of the inside and outside diameter of the bushing, and the inside diameter of the housing.  (Lukasik Dep., at p. 24:3-23.)  The measurements revealed a difference of 0.0043 inches between the inner diameter of the housing and the outer diameter of the bushing.  (Tr. Exh. 202, at p. 17.)  The inside diameter of the bushing also exhibited varying degrees of "thermal related bluing and scoring."  (*Id.*, at p. 16.)

73.    Around the same period, a letter from Mr. P. Keil, Director of Maintenance at WestAir, sent a letter to the Namibian investigators explaining the mistake in the identification of the IO-550 Fuel Pump during the investigation of the Accident:  "Our Purchase Requisition No. 41428, reflects the serial number B04JA223-R, which is a number that was written on the air cooling shroud with a permanent marker . . . Our engineer unfortunately made a mistake.  We confirm that the suspect fuel Pump Serial No. B07JA132R actually went to Alton Air."  (Lukasik Dep., at pp. 71:14-83:20; Tr. Exh. 51.)

74.    On January 12, 2011, Defendant, along with its experts and investigators, performed a fuel pump test on a calibrated production test bench (the "January 12 test") to determine whether the conditions described by Mr. Webb, (*supra*, Ct. FOF, at ¶¶ 64-65), would result in a loss of fuel flow and engine power.  (Lukasik Dep., at pp.

34:18-35:22, 92:1-109:23; Eberly Dep., at pp. 54:19-62:10; Tr. Exh. 202, at 18.) Measurements obtained during the South African inspection, (*supra*, Ct. FOF, at ¶ 72), were used to simulate the operation of the IO-550 Fuel Pump.  (Lukasik Dep., at pp. 34:18-35:22, 92:1-109:23; Eberly Dep., at pp. 54:19-62:10; Tr. Exh. 202, at 18.)

75.    The January 12 test determined that the conditions described by Mr. Webb would not prevent fuel flow to the IO-550 Engine, nor would it cause a loss of engine power or otherwise impact normal fuel flow and operation.  (Tr. Exh. 202, at p. 20.) The January 12 test also determined that a clearance of 0.0043 inches between the bushing and housing would still allow a fuel flow capability of 115 pounds per hour during flight.  (*Id*.)

### F.    The Namibian Lawsuit

76.    Separately, on May 7, 2009, Plaintiffs filed a lawsuit in Namibia against Scenic Air (the "Namibian Lawsuit"), claiming that pilot error caused the Accident.  (M. Higley Tr. Day 3, Vol. 2, at 28:18-21, 32:7-36:5; Tr. Exh. 219.)

77.    Plaintiffs, however, later settled the Namibian Lawsuit.  (M. Higley Tr. Day 3, Vol. 2, at 22:22-23:15; Tr. Exh. 219.)

### CONCLUSIONS OF LAW

78.    Plaintiffs assert a single manufacturing defect claim, namely that the IO-550 Fuel Pump manufactured by Defendant was defective when it left Defendant's possession.  (Pls. Tr. Brief, at pp. 1-2.)

79.    Preliminarily, the Court finds that the parties' experts were all qualified to testify as such at trial.  (*See* C. Sommer Tr. Day 1, at 101:2-105:5; D. Sommer Tr. Day 2, at 60:8-81:6; Kar Tr. Day 3, Vol. 1, at 47:13-52:19; Edwards Tr. Day 3, Vol. 2, at 78:6-114:13; Barton Tr. Day 4, Vol. 2, at 49:24-54:18; Morris Tr. Day 4, Vol. 4, at 58:22-63:19; *see also* Tr. Exhs. 96, 666.)

80.    Next, and before it can reach the merits of Plaintiffs' claim, the Court must determine whether the IO-550 Fuel Pump, as opposed to the IO-520 Fuel Pump, was indeed on the Aircraft at the time of the Accident, as Plaintiffs contend.  (Pls. Supp.

FOF, at ¶¶ 8-11, 13; Pls. Tr. Brief, at pp. 5, 6-7, 11, 24.)

81.     Here, the weight of the evidence leads to the conclusion that the IO-550 Fuel Pump was on the Aircraft on the day of the Accident.  In particular, there is no credible proof that the IO-550 Fuel Pump was ever removed from the IO-550 Engine after it was installed on the Aircraft on January 14, 2008.  (*See, e.g.*, *supra*, Ct. FOF, at ¶¶ 19-20; C. Sommer Tr. Day 1, at 138:10-139:8 (stating that Scenic Air had "very detailed records showing exactly what was happening to the engine every single time they serviced it."); Edwards Tr. Day 4, Vol. 1, at 47:21-48:6, 68:3-15; *see also* Tr. Exhs. 400-05, 619, 621.)

82.     Defendant has also failed to provide any *reasonable* explanation for why the IO-520 Fuel Pump, with 1,640 hours logged, would be placed inside the brand new IO-550 Engine.  (*See supra*, Ct. FOF, at ¶¶ 19-21; Def. FOF, at ¶¶ 100-02, 110, 120, 129-30; Def. Conclusions of Law ("COL"), at ¶ 10.)  Instead, Mr. Edwards, Defendant's expert, appears to suggest that the IO-550 and the IO-520 Fuel Pumps may have been "swapped" during routine troubleshooting at WestAir.  (Edwards Tr. Day 4, Vol. 1, at 70:16-74:2.)  In support thereof, Defendant notes that the IO-550 and IO-520 Fuel Pumps were *both* removed from their respective Engines during the installation of the IO-550 Engine on the Aircraft.  This, in turn, explains why the IO-520 Fuel Pump shroud was mistakenly placed over the IO-550 Fuel Pump.  (*Supra*, Ct. FOF, at ¶¶ 18-21; C. Sommer Tr. Day 1, at 125:4-126:1 (Defendant's fuel pumps are designed and shipped without shrouds), 153:10-156:4 (confirming that an inlet "cut out" was added to the IO-520 shroud to accommodate the IO-550 Fuel Pump).)

83.     Although the Court is cognizant of Defendant's "scavenger theory," (*see* Lukasik Dep., at pp. 89:18-90:12; Momsen Dep., at pp. 39:13-40:17; C. Sommer Tr. Day 1, at 140:4-12; Barton Tr. Day 4, Vol. 1, at 18:22-25:10, 27:11-29:12, 39:9-24, Vol. 3, at 59:9-15; Tr. Exhs. 202, 619), it remains unpersuaded.  Not only is there a lack of evidence to support such a theory, (*supra*, Ct. COL, at ¶¶ 81-82), there is also no plausible explanation, supported by the evidence, why Scenic Air would fail to

notify Defendant of a problem with the IO-550 Fuel Pump as soon as it came to its attention.  (Edwards Tr. Day 4, Vol. 1, at 71:13-75:4.)

84.   Instead, the Court finds the straightforward argument to be the most convincing – namely, that the etched shroud from the IO-520 Engine was mistakenly placed on the new IO-550 Engine, which housed the IO-550 Fuel Pump.  Since the shroud covered the IO-550 Fuel Pump's serial and part numbers, the Namibian authorities mistakenly identified the wrong fuel part during their investigation.  (*Supra*, Ct. FOF, at ¶ 61; C. Sommer Tr. Day 1, at 121:24-122:19; *see* Tr. Exh. 201.)

85.   Having determined the preliminary matters before it, the Court now turns to the merits of Plaintiffs' claim.  Specifically, to succeed on a manufacturing defect claim under California law, Plaintiffs must prove that:  (a) Defendant manufactured, distributed, or sold the IO-550 Fuel Pump; (b) the IO-550 Fuel Pump contained a manufacturing defect when it left Defendant's possession; (c) Plaintiffs were harmed while the IO-550 Fuel Pump was used in a reasonably foreseeable way; and (d) the IO-550 Fuel Pump defect was a substantial factor in causing Plaintiffs' harm.  *Soule v. GM Corp.*, 8 Cal. 4th 548, 560 (1994); *Cronin v. J.B.E. Olsen Corp.*, 8 Cal. 3d 121, 127-28 (1972); *see also* California Civil Jury Instructions ("CACI") No. 1201.

86.   The Court first notes that neither side appears to contest that Defendant manufactured the IO-550 Fuel Pump and, moreover, that certain damage did, in fact, appear within that part.  (Finkel Tr. Day 1, at 15:15-19; Skinner Tr. Day 5, Vol. 2, at 49:19-50:2.)  Likewise, there is little dispute that Plaintiffs were harmed during the Accident, which occurred while the IO-550 Fuel Pump was on the Aircraft.  (*Supra*, Ct. FOF, at ¶ 54; *supra* Ct. COL, at ¶¶ 81-84.)

87.   Rather, the pertinent questions here appear to be two-fold, namely (1) did the IO-550 Fuel Pump contain a manufacturing defect when it left Defendant's possession? and (2) was the defect a substantial factor in causing Plaintiffs' harm?  The Court addresses each question in turn.

88.   First, with respect to whether the IO-550 Fuel Pump contained a manufacturing

defect when it left Defendant's possession, Plaintiffs contend that there is no evidence that the IO-550 Fuel Pump was ever "altered or modified between the time it left [Defendant] and the time of the crash." (Pls. Supp. FOF, at ¶ 28; Pls. Supp. COL, at ¶ 3(b).) Plaintiffs also note that when the IO-550 Fuel Pump was first opened after the Accident, Mr. Webb determined that the defective drive shaft was too large and, as a result, there was binding within its bushing, thus causing the Accident. (Pls. Supp. FOF, at ¶¶ 40-44; Pls. Tr. Brief, at pp. 24-25.) Defendant, in turn, alleges that the IO-550 Fuel Pump was not defective when it left its possession. (Def. Supp. FOF, at ¶¶ 41-43; Def. Supp. COL, at ¶ 5.)

89.    Here, and based on the unique circumstances of this case, the Court finds that Plaintiffs have not met their burden of proving that the IO-550 Fuel Pump contained a manufacturing defect when it left Defendant's possession. Several reasons guide this determination.

90.    First, there is no indication that the shaft was indeed too large to fit within its bushing, as Plaintiffs' expert assumes when applying the "slip stick" phenomenon.[1] (*See, e.g.*, Kar Tr. Day 3, Vol. 1, at 79:14-20, 81:1-82:8, 82:9-83:9, 83:12-14, 88:16-22; Barton Tr. Day 4, Vol. 3, at 71:18-72:21; Tr. Exhs. 606-612.) Initially, the Court questions the accuracy of the shaft measurements relied on by Plaintiffs' expert. (Kar Tr. Day 3, Vol. 1, at 40:11-43:22.) As Defendant's experts point out, not only do these

---

[1]  The "slip stick" theory suggests that an oversized shaft creates wear on the bushing when it "sticks" to its inner diameter during rotation. (Kar Tr. Day 3, Vol. 1, at 81:1-82:8.) The Court, however, finds Defendant's theory relating to wear on the bushing as more credible. In particular, Defendant explains that the marks on the inner diameter of the bushing were simply the result of normal wear that occurs when a harder surface (here, the steel shaft) rubs against a softer surface (the bronze bushing). (Morris Tr. Day 5, Vol. 1, at 41:21-48:16.) And, moreover, it is unclear *how* the steel shaft would "stick" to the soft surface of the bushing, as Dr. Kar contends, since it appears likely that the bushing would break under such conditions. (*Id.*, at 21:24-23:2; Kar Tr. Day 3, Vol. 1, at 102:14-17 (Dr. Kar conceding that he did not test the "hardness" of the metals).)

measurements contradict those taken at the South African inspection (in which *both* parties fully participated), but they were also taken with a less reliable instrument. (*Supra* Ct. FOF, at ¶ 72; Kar Tr. Day 3, Vol. 1, at 112:21-113:14, 123:19-124:5 (agreeing that the testing laboratory, known as Seal Labs, "couldn't get [the Hirox microscope] to work properly," and also stating that he did not know whether Seal Labs calibrated the caliper); Barton Tr. Day 4, Vol. 3, at 75:9-20; Tr. Exh. 610.)

91.    Even putting questionable measurements aside momentarily, it is not altogether clear *how* Defendant could have assembled an oversized shaft *from the start*, as it would be infeasible to fit an oversized shaft into its bushing.  (Barton Tr. Day 4, Vol. 3, at 13:18-14:6, 71:18-73:18; Barton Tr. Day 4, Vol. 3, at 13:22-14:5, 32:8-14; Morris Tr. Day 5, Vol. 1, at 37:25-38:13, 43:15-46:12.)  Even assuming that Defendant forced an oversized shaft into the bushing, several questions then arise – perhaps most poignantly, for instance, how was the IO-550 Fuel Pump able to function properly for so many hours – and Plaintiffs fail to persuasively address such questions.  (Barton Tr. Day 4, Vol. 3, at 13:18-14:6, 71:18-73:18; Morris Tr. Day 5, Vol. 1, at 37:25-38:13.)

92.    Second, the IO-550 Fuel Pump, in both its basic and assembled form, was inspected and tested for defects *many* times over the course of *several* years, including at TAT in Israel and Defendant's own testing facilities.  (*See supra*, Ct. FOF, at ¶¶ 6, 9-11; Edwards Tr. Day 4, Vol. 1 at 48:25-50:19; Barton Tr. Day 4, Vol. 3, at 12:12-17, 13:22-14:5, 32:8-22 (TAT and Defendant's testing would have caught "slip stick" phenomenon and whether shaft too large for bearing), Barton Tr. Day 4, Vol. 4, at 22:6-23:22, 25:16-26:4; Tr. Exhs. 647-654.)  No defect or abnormality was ever found.[2]  (Barton Tr. Day 4, Vol. 3, at 23:11-19.)

---

[2]  Nor will the Court consider as evidence the absence of any prior, similar incidents with the 200,000 plus fuel pumps manufactured by Defendant since the 1950s, or with any of the 169 other basic fuel pumps manufactured, assembled, and tested by TAT. Because Plaintiffs solely allege a *manufacturing* defect claim, rather than a *design* defect claim, or any claim sounding in negligence, the Court may not consider such evidence. *See, e.g.*, *Jones v. Pak-Mort Mfg. Co.*, 145 Ariz. 121, 129 n.4 (1985)

93.     Specifically, once the basic pumps are sent to Defendant, each is built to assembly, and tested again with its own specifications.  (Barton Tr. Day 4, Vol. 3, at 20:9-21, 24:4-26:21, 25:13-26:9; *supra*, Ct. FOF, at ¶¶ 6, 9-11.)  The assembled fuel pump is later put on a test engine, and tested for another 1.5 hours.  (Barton Tr. Day 4, Vol. 3, at 20:9-18.)

94.     After the IO-550 Fuel Pump was assembled to the IO-550 Engine in October of 2007, Defendant conducted still more tests.  (*See supra*, Ct. FOF, at ¶ 10; Barton Tr. Day 4, Vol. 3, at 20:9-21, 31:19-32:7, 33:6-35:22, 36:1-37:1; Tr. Exhs. 225, 655.)  Again, no defect or abnormality was detected.  (*Id.*)

95.     Nor can it be said that TAT or Defendant used improper quality control testing mechanisms.  (*See id.*; *see also* C. Sommer Tr. Day 1, at 56:2-9.)  Plaintiffs argue that Defendant provided no documentation substantiating TAT's quality control procedures.  (Barton Tr. Day 4, Vol. 4, at 22:6-23:15.)  TAT's procedures, however, have been approved by the FAA.  (*Id.*, at 22:6-23:15.)  And, TAT is not a "small shop" in a "dingy. . . corner," but is, instead, a "major operation . . . that has a reputation." (Finkel Tr. Day 5, Vol. 2, at 8:7-14.)

96.     Three MPIs were also conducted on the IO-550 Fuel Pump prior to the Accident, (*supra*, Ct. FOF, at ¶¶ 23-25), the results of which were normal and consistent with otherwise functioning fuel pumps.  (C. Sommer Tr. Day 1, 235:1-12; Edwards Tr. Day 3, Vol. 2, at 154:9-17; Barton Tr. Day 4, Vol. 3, at 36:2-37:1, 37:25-

---

("Cases involving a manufacturing flaw do not implicate the inherent design or quality of the entire line of products in question, but only the quality of a particular unit or number of units of that product.  In such cases, the fact that the product as a whole has a demonstrated safety-history is irrelevant."); *see also Lokai v. Mac Tools, Inc.*, 2007 WL 1666025, at *4 (S.D. Ohio June 5, 2007) ("The Court agrees with the reasoning in *Jones*.  If a certain product design is defective, the defect would be present in all products sharing the defective design . . . A manufacturing defect, on the other hand, may be present in only a single manufactured item.  Hence, the absence of prior accidents is not probative of whether a particular manufactured item contains a manufacturing defect.").

38:23, 39:9-41:13, 43:6-44:11, 45:6-48:2; Tr. Exhs. 203-05, 273, 657; *see also* Stip., at ¶ 11.)

97.     Then, on May 12, 2008, mere days after the Accident, the IO-550 Fuel Pump and IO-550 Engine were tested *again*, and no defect was detected (the "May 12 test"). (*See supra*, Ct. FOF, at ¶ 57-58; Barton Tr. Day 4, Vol. 2, at 73:3-75:4, Vol. 3, at 51:23-52:11; *see also* C. Sommer Tr. Day 1, at 195:12-25 (Plaintiffs' mechanical engineering expert acknowledged that he had never seen a spun bushing before).)  The May 12 test also revealed that the IO-550 Engine accelerated properly to its highest RPM and operated with a "full rich" fuel mixture.  (Barton Tr. Day 4, Vol. 2, at 73:3-75:4, Vol. 3, at 51:23-52:11.)  The "full rich" indicator, in turn, suggested that the IO-550 Fuel Pump was operating normally.  (*Id.*)

98.     Third, the evidence at trial demonstrates that the coupling over the IO-550 Fuel Pump did not break, as would be expected if the bushing were indeed spinning in its housing during the Accident flight.  (*See, e.g.*, Barton Tr. Day 4, Vol. 3, at 60:21-61:8, 64:10-65:1; Morris Tr. Day 5, Vol. 2, at 55:1-10; Eberly Dep., at p. 37; Tr. Exh. 343.) Plaintiffs, in reply, contend that this argument is merely a "red herring."  (Finkel Tr. Day 5, Vol. 2, at 75:11-76:5; *see also* C. Sommer Tr. Day 1, at 47:10-48:12.)  The Court, however, finds Defendant's expert more reliable in this instance.  As Mr. Barton explained, more torque is required to spin the bushing within the housing than is required to break the coupling.  (Barton Tr. Day 4, Vol. 3, at 61:9-64:8 (stating that 338 inch pounds of torque is required to move bushing, while 192-210 inch pounds of torque is required to break coupling).)  Thus, if the IO-550 Fuel Pump were indeed defective, its coupling would have surely broken.  The coupling, however, was found intact.  (*Supra*, Ct. FOF, at ¶ 58; Barton Tr. Day 4, Vol. 3, at 61:9-64:8; Tr. Exh. 343.)

99.     Fourth, and relatedly, a critical torque test conducted by Plaintiffs' experts appears to have been based on a mathematical flaw, ultimately impacting the veracity of its conclusions.  (C. Sommer Tr. Day 1, at 220:15-228:25.)  In particular, the Sommers miscalculated the amount of torque required to spin the bushing inside of its

housing.  (*Id.*; Tr. Exh. 97.)  If the Sommers' calculation *were* correct, the coupling should have – and would have – broken as expected.  (Barton Tr. Day 4, Vol. 3, at 61:9-64:8, 51:23-52:12.)  That fact that it did not break, however, lends additional heft to Defendant's position.

100.   Fifth, Plaintiffs allege that the IO-550 Fuel Pump was defective because the Aircraft reached 150 pounds per hour during the takeoff run, (*supra*, Ct. FOF, at ¶¶ 44-46), which could not have occurred unless the bushing were improperly spinning in its housing.  (C. Sommer Tr. Day 1, at 174:2-21, 175:8-177:24, Tr. Day 2, at 5:12-25:4, 43:3-11; D. Sommer Tr. Day 2, at 148:2-154:19.)  The spike in fuel flow, however, appears to have been a normal course of affairs in a Cessna 210.  (Edwards Tr. Day 4, Vol. 2, at 13:17-14:10; Momsen Dep., at pp. 27:15-28:23 (noting that an increase to 150 pounds per hour is "quite normal practice" in a Cessna 210, since there is "no indication until that aircraft is running at full RPM where to exactly set that fuel flow or that mixture to").)

101.   Moreover, Plaintiffs' own expert concedes that "there was no evidence either way" to determine whether the bushing spun before, during, or after takeoff, and as a result, no evidence to demonstrate *when* the IO-550 Fuel Pump was, in fact, damaged.[3] (C. Sommer Tr. Day 2, at 27:2-4; *see also* D. Sommer Tr. Day 2, at 241:3-9, 248:7-9, 253:3-10 (nothing in the Sommers' reports indicates that bushing spun *before* Aircraft was airborne).)

102.   Sixth, the Court finds unavailing Plaintiffs' contention that the IO-550 Engine was operating at 69-77 pounds per hour (*i.e.*, a thirty percent reduction from 110 pounds per hour due fuel flow loss from the IO-550 Fuel Pump).  (*See, e.g.*, C.

---

[3] To that end, the Court **DENIES** Defendant's Motion to Exclude Testimony that the bushing moved *prior* to becoming airborne.  (D. Sommer Tr. Day 2, at 25:14-27:7.) While the Court is cognizant of the discrepancy in the testimony of Plaintiffs' experts, it will, in the interest of justice, admit such evidence and, thereafter, determine the weight to accord the testimony.

Sommer Tr. Day 1, at 176:1-177:24.)  First, Plaintiffs' experts failed to provide a satisfactory explanation for how they arrived at their calculation of 69-77 pounds per hour.  (*Id.*; D. Sommer Tr. Day 2, at 152:22-153:24, 173:10-14, 217:17-218:1, 219:16-220:3.)  In particular, Plaintiffs' experts never adequately explained *why* the fuel flow gauge in the Aircraft would read 110 pounds per hour, when the gauge itself is set at 130 pounds per hour and, importantly, when the gauge *always* displays an accurate level of fuel flow.  (C. Sommer Tr. Day 1, at 241:7-242:17, Day 2, at 16:9-20:9; D. Sommer Tr. Day 2, at 215:16-2:18-8; Edwards Tr. Day 3, Vol. 2, at 164:18-165:18.)  Even worse, Mr. Sommer failed to provide *any* explanation for his low end calculation of 69 pounds per hour.  (D. Sommer Tr. Day 2, at 218:16-219:12.)

103.   Even assuming Plaintiffs' calculations were correct, the loss of fuel flow at 69-77 pounds per hour would lead to a reduction in fuel flow and, in turn, be immediately evident to a pilot.  (Webb Dep., at pp. 412-15, 50:1-15; *see also* POH, at pp. 3-18:3-19 ("Failure of the engine-driven fuel pump will be evidenced by a sudden reduction in the fuel flow indication prior to a loss of power[.]")  McConnell, however, did not recall any abnormalities on the fuel flow indicator.  (*Supra*, Ct. FOF, at ¶ 48.)

104.   Nor can it be said that the IO-550 Engine *could* operate normally at 69-77 pounds per hour of fuel flow.  (D. Sommer Tr. Day 2, at 217:19-218:13; Barton Tr. Day 4, Vol. 2, at 70:25-73:2; Edwards Tr. Day 4, Vol. 2, at 36:19-37:11, 71:20-72:2, 72:20-24, 72:3-73:2.)  Here, of course, the IO-550 Engine was operating without issue during the Accident flight.  (*Id.*; *see also supra* Ct. FOF, at ¶ 48.)  And, importantly, Plaintiffs' experts concede that even at 98 pounds per hour – thirty percent of 130 pounds per hour, the number actually displayed on the fuel flow gauge – the Aircraft could have continued its rate of climb.  (C. Sommer Tr. Day 1, at 251:11-253:5, 176:1-177:24, 252:11-253:8, Day 2, at 52:24-55:10, 36:20-37:25.)

105.   In contrast, the evidence appears to suggest that the IO-550 Fuel Pump was damaged when it was mistakenly run dry during a fuel flow test bench *after* the Accident.  In particular, the "bluing" of the bushing, and the lack of bromine

discovered in the IO-550 Fuel Pump, suggests that the damage to the part could not have occurred on a running engine. (Morris Tr. Day 5, Vol. 1, at 17:2-23; Tr. Exhs. 668, 670.) As Mr. Morris explained during trial, "bluing" occurs at approximately 300 to 400 degrees Fahrenheit; at this temperature, the fuel in the Aircraft would have already vaporized. (*Id.*, at 13:12-24.) Accordingly, such heat could have only resulted if an engine were run dry on the ground. (*Id.*) And, moreover, the *lack* of bromine provides further support that the IO-550 Fuel Pump was run dry on a test bench using artificial (rather than aviation) fuel. (Skinner Tr. Day 5, Vol. 2, at 64:24-65:6.)

106.   In response, Plaintiffs argue that a test bench with a large enough engine to properly spin the bushing does not exist. (C. Sommer Tr. Day 1, at 168:8-25, 169:17-170:18; D. Sommer Tr. Day 2, at 175:9-11, 176:3-177:10.)

107.   Defendant does not disagree with this point. (Barton Tr. Day 4, Vol. 4, at 18:11-17, 52:18-55:14; Morris Tr. Day 5, Vol. 1, at 47:8-17.) Defendant argues, however, that the amount of horsepower required to spin the bushing is nowhere near the amount that Plaintiffs' experts suggest. (*Id.*) In particular, the components within a fuel pump are disassembled when they are heated to 300 to 400 degrees Fahrenheit. (Barton Tr. Day 4, Vol. 4, at 53:15-16, 53:24-54:2; Morris Tr. Day 5, Vol. 1, at 10:13-15:2, 55:20-56:8; *see also* Eberly Dep., at pp. 47:20-48:2) (basic fuel pump "will loosen up when you get it hot.") Thus, at this temperature, the friction force between the shaft and bushing decreases, as does the amount of torque required to spin the bushing. (Morris Tr. Day 5, Vol. 1, at 51:15-52:25.)

108.   Here, "bluing" was found on the bushing, rather than the steel shaft itself, indicating that the temperature in the IO-550 Fuel Pump was between 300 to 400 degrees. (Morris Tr. Day 5, Vol. 1, at 11:2-8, 29:25-37:19, 51:9-52:25.) This, in turn, suggests that the bushing was able to spin in the housing with the application of only a small amount of torque. (*Id.*) It also explains why Mr. Webb was able to remove the bushing from the housing using only his hands. (*Id.* at 55:9-14; *see also supra*, Ct. FOF, at ¶ 65; *supra,* Ct. COL, at ¶ 91.)

109.   Thus, and under the totality of the circumstances discussed above, the Court finds that Plaintiffs have not met their burden of proving that a manufacturing defect existed on the IO-550 Fuel Pump when it left Defendant's possession.

110.   The Court next turns to whether the alleged defect in the IO-550 Fuel Pump was a substantial factor in causing Plaintiffs' harm.[4]

111.   Plaintiffs argue here that the defect in the IO-550 Fuel Pump caused the drive shaft to bind in its bushing.  (Pls. Supp. FOF, at ¶¶ 91-93, 100-01.)  The bushing, in turn, spun within its housing, causing a loss of fuel flow and pressure, and, ultimately, the Accident itself.  (*Id*., at ¶¶ 105, 111.)  Defendant, for its part, contends that pilot error was the "sole cause" of the Accident.  (Def. Supp. COL, at ¶ 9.)

112.   To determine whether a defective product was a substantial factor in causing the injury, "[a] [p]laintiff need not establish that a defendant's product was the sole potential proximate cause of injury, but only that the defendant's conduct substantially contributed to the injury and the circumstances make it just to hold the defendant responsible for the consequences of the accident."  *Bunch v. Hoffinger Indus., Inc.*, 123 Cal. App. 4th 1278, 1302 (internal citations omitted); *see also McGee v. Cessna Aircraft Co.*, 139 Cal. App. 3d 179, 190-91 (1983) (in strict liability action against plane manufacturer, court erred in using instruction describing "but for" causation rather than "substantial factor" causation, where fire which injured victim could have resulted either from severity of impact or design of aircraft).

113.   Here, Plaintiffs have not met their burden of proving that the defect within the IO-550 Fuel Pump was a *substantial factor* in causing their harm.  The Court comes to this conclusion for several reasons.

114.   Preliminarily, evidence presented at trial paints a picture of McConnell as an inexperienced and overconfident pilot in command.  (*See, e.g.*, D. Sommer Tr. Day 2,

---

[4]  Although the above analysis may dispose of Plaintiffs' claim altogether, the Court will, in the interest of justice and comprehensiveness, address and analyze the merits of Plaintiffs' claim under the substantial factor element below.

at 270:16-25; Edwards Tr. Day 3, Vol. 2, at 35:17-36:5; Tr. Exh. 614.)  Briefly, and without listing *every* shortcoming, prior to the Accident flight, McConnell failed to conduct critical calculations (including measuring density altitude), follow standard aircraft control procedures, consult written pre-flight checklists, and check the fuel quality and quantity.  (Edwards Tr. Day 3, Vol. 2, 122:15-123:6; D. Sommer Tr. Day 2, at 268:25-269:4, 269:9-25, 270:1-25; Tr. Exh. 614; *supra*, Ct. FOF, at ¶¶ 33-34, 36-38.)  It also appears that McConnell only "eyeballed" the weight of the passengers, failed to weigh all of the luggage using the T scale, and, moreover, failed to tie the luggage down as required by the POH.  (D. Sommer Tr. Day 2, at 211:16-18; Barton Tr. Day 4, Vol. 2, at 9:25-10:20; Tr. Exh. 614; *supra*, Ct. FOF, at ¶¶ 39-42.)  And, the calculations that McConnell *did* perform were improperly measured in kilograms, rather than pounds.  (*Id.*)

115.   During the Accident flight and ensuing altitude loss, moreover, McConnell failed to retract the flaps, consult an engine failure checklist or use auxiliary fuel pumps, and only sumped the gas tanks once rather than twice (and, what's more, did so improperly from the gas caps).  (D. Sommer Tr. Day 2, at 205:10-208:11; Edwards Tr. Day 3, Vol. 2, at 122:21-126:6, 128:14-129:3; 153:10-22, 155:25-158:17; Barton Tr. Day 4, Vol. 1, at 12:14-15, 34:2-35:8, 40:15-43:12; *supra*, Ct. FOF, at ¶¶ 44, 46-47, 51-52.)

116.   Nor did McConnell retract the landing gear soon enough to prevent excessive drag on the Aircraft during the decay in airspeed and altitude.  (Edwards Tr. Day 3, Vol. 2, at 122:21-123:6, 171:15-172:8; Barton Tr. Day 4, Vol. 2, at 24:7-15; *supra*, Ct. FOF, at ¶ 52.)  Similarly, McConnell's emergency landing plan to fly over a tree and under high-tension power wires proved unnecessarily reckless.  (Barton Tr. Day 4, Vol. 2, at 36:6-38:4; *supra*, Ct. FOF, at ¶ 53.)

117.   Second, there is also evidence that the Aircraft was, at a minimum, above suggested weight, and, at its most egregious, grossly overweight when it departed Eros Airport.  (*See, e.g.*, D. Sommer Tr. Day 2, at 142:11-24, 147:21-150:9, 172:6-181:16,

210:12-212:23.)  Mr. Lukasik, for example, opined that the Aircraft was over one hundred and fifty pounds over gross weight.  (Lukasik Dep., at pp. 57:14-59:11.)  Mr. Edwards, for his part, surmised that the Aircraft was nearly *four hundred pounds* over gross weight.  (Edwards Tr. Day 3, Vol. 2, at 142:22-24, 177:10-19, 179:4-21; Tr. Exh. 614-15.)  As discussed above, there is evidence that McConnell failed to accurately calculate the weight and balance of the Aircraft and its passengers and luggage.  (*Supra*, Ct. FOF, at ¶¶ 39-42; *supra* Ct. COL, at ¶ 114; *see, e.g.*, Tr. Exh. 202, at p. 7-8 (noting that McConnell failed to account for certain luggage aboard the Aircraft).)

118.   The evidence also suggests a fuel discrepancy in the Aircraft on the day of the Accident.  (Edwards Tr. Day 3, Vol. 2, at 141:9-143:10; *supra*, Ct. FOF, at ¶ 37.)  In particular, although McConnell requested 310 liters of fuel on the Aircraft prior to takeoff, the fuel receipt reflects an addition of only 185 liters of fuel.  (Edwards Tr. Day 3, Vol. 2, at 141:9-142:24; Barton Tr. Day 4, Vol. 1, at 86:15-20.)  On balance, the discrepancy indicates that McConnell did not know how much fuel was on the Aircraft, thus preventing him from properly calculating the weight limitations on the Accident flight.  (Edwards Tr. Day 3, Vol. 2, at 141:9-142:24; Barton Tr. Day 4, Vol. 1, at 86:15-20.)  Nor is there any indication that a revised weight and balance sheet was issued to reflect the additional fuel weight, or measure the additional fuel in the fuel tip tanks.  (Edwards Tr. Day 3, Vol. 2, at 136:7-139:25.)

119.   In the end, and in light of the instances of pilot error on the Accident flight[5], and

---

[5]  Defendant also appears to argue – for the first time – that "Plaintiffs are judicially estopped from any argument other than" those presented in the Namibian Complaint.  (*See* Ct. FOF, at ¶¶ 76-77; Def. Supp. COL, at ¶ 10-13.)  The Court need not decide whether Plaintiffs are, in fact, judicially estopped from their arguments, and, instead, rejects Defendant's untimely argument in the interest of justice.  *See North Pacifica, LLC v. City of Pacifica*, 366 F. Supp. 2d 927, 929-30 (N.D. Cal. 1995) (with respect to doctrines of preclusion and collateral estoppel, party waived its affirmative defense where it was not raised until one year after trial on issue of liability) (citing *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730, 734-35 (9th Cir. 1988) (res judicata defense deemed waived as it was not raised "until after the end of the trial")); *Chi v.*

evidence that the Aircraft was overweight, the Court finds that the alleged defect within the IO-550 Fuel Pump was not a substantial factor in causing Plaintiffs' harm.

## **CONCLUSION**

Based on the foregoing, the Court finds that Plaintiffs have not proven that they are entitled to relief under their manufacturing defect claim.

**IT IS SO ORDERED.**

DATED:  September 20, 2013          _____

JAY C. GANDHI
UNITED STATES MAGISTRATE JUDGE

_Allstate Ins. Co._, 2009 WL 2473512, at *2 (W.D. Wash. Aug. 6, 2009) ("Defendant first raised the insufficient service defense in this motion [for summary judgment], after it filed its answer.  Defendant has waived this defense by failing to timely assert it."); _Hill v. Blind Industries & Services of Maryland_, 179 F.3d 754, 757-58 (9th Cir. 1999) ("Timely disclosure provides fair warning to the plaintiff, who can amend the complaint, dismiss the action . . ., or request a prompt ruling on the . . . defense before the parties and the court have invested substantial resources in the case.").